IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. CCB-16-307 |
| | * | |
| JOHN M. KAYS, *et al*. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM

In 2017, John M. Kays ("J. Kays") and Danielle N. Kays ("D. Kays") pled guilty to offenses related to their participation in a scheme to obtain government contracts through bribery. Now pending is the government's motion seeking restitution as to D. Kays and increased restitution as to J. Kays. (ECF 96). The Kayses oppose the motion, (ECF 100, 103, 105), and a hearing was held on January 17, 2018, (ECF 106). For the reasons explained below, the government's motion will be denied.

### BACKGROUND

In late 2008, J. Kays was a civilian employee of the Department of the Army and Michael Barrow was employed at a glass company. (ECF 76 at 9). The two men, who were longtime friends, agreed to a scheme where J. Kays would steer Army business to MJ-6, a company formed by Barrow. (*Id*.). In exchange, Barrow would steer the glass company's business to Transportation Logistics Services ("TLS"), a company formed by J. Kays. (*Id*.). As part of this scheme, J. Kays used his influence as a Department of the Army employee to ensure that MJ-6 obtained subcontracting work on various government contracts. (*Id*. at 9–10). Several such MJ-6 subcontracts resulted in government payments to MJ-6 for the cost of two "no-show employees," who did no work on the contract but were added into MJ-6's subcontract proposal for the purpose of artificially inflating MJ-6's profits. (*Id*. at 10–15).

1

In return for J. Kays's steering of Army business to MJ-6, Barrow directed glass company business to TLS. (ECF 76 at 12). In 2010, however, the glass company fired Barrow when it discovered that Barrow was failing to follow its procedures regarding vendors and was issuing payments to TLS without a contract. (*Id.*).

In January 2011, Barrow began making cash payments to J. Kays in exchange for J. Kays's continued work securing government contracts for MJ-6. (ECF 71 at 12). The payments came from MJ-6's profits. (*Id.*). In 2012, D. Kays—J. Kays's wife and also a civilian employee of the Army—helped secure two government contracts for MJ-6. (ECF 71 at 9, 13–16). D. Kays knew, or willfully blinded herself to the fact, that J. Kays was receiving cash from Barrow and that the Kayses' aid to MJ-6 in obtaining government contracts enabled the couple to reap financial reward. (*Id.* at 13–15).

In October 2012, Barrow informed the Kayses that he would no longer deliver their share of MJ-6's profits in cash. (ECF 71 at 16–17). The three planned that the Kayses would continue their work on behalf of MJ-6, but that Barrow would pay the Kayses their share of the profits after either J. or D. Kays left government service, when the payments could be disguised as salary or consulting fees. (*Id.* at 17).

In 2014, the Army began investigating J. Kays's relationship with MJ-6, (ECF 71 at 17), and J. Kays abruptly left government service in July 2014, (ECF 76 at 18). Barrow refused to put J. Kays on MJ-6's payroll, at which point the relationship between the Kayses and Barrow soured. (ECF 71 at 17–19). Between 2013 and 2015, MJ-6 received payments on government contracts put in place by the Kayses, but Barrow did not pay any portion of MJ-6's profits on these contracts to the Kayses. (*Id.* at 19). D. Kays left government service in October 2015. (*Id.* at 19).

\*   \*   \*

On June 21, 2016, J. Kays and Barrow were indicted on conspiracy and bribery charges, in violation of 18 U.S.C. §§ 371 and 201. (ECF 1). A superseding indictment, filed on January 17, 2017, brought additional charges and added D. Kays as a co-defendant. (ECF 41).

On September 7, 2017, D. Kays pled guilty to one count of conspiracy to defraud the United States and to commit bribery, in violation of 18 U.S.C. § 371. (ECF 71). On September 8, 2017, J. Kays pled guilty to one count of bribery, in violation of 18 U.S.C. § 201(b)(2)(A) and (C). (ECF 76). Judgment was entered against D. Kays on November 8, 2017; she was sentenced to 18 months' incarceration followed by one year of supervised release, and it was determined that any restitution as to D. Kays would be set at a later date. (ECF 93). Judgment was entered against J. Kays on June 19, 2018; he was sentenced to 72 months' imprisonment followed by three years of supervised release, and was ordered to pay $886,519.52 in restitution. (ECF 118).[1] The court determined that J. Kays's co-defendants, D. Kays and Barrow, were jointly and severally liable for this restitution. (*Id.* at 5–6). Barrow also pled guilty to one count of bribery, (ECF 62), was sentenced to 30 months' incarceration, and was found solely responsible (rather than jointly and severally liable with the Kayses) for $886,519.52 in restitution, (ECF 138).

The government filed a motion for additional restitution against the Kayses, seeking a total of $1,153,132.94 from J. Kays and $818,175.38 from D. Kays. (ECF 96 at 4). The parties agree that $886,519.52 was the amount of money the government paid to MJ-6 for "no-show" employees. (ECF 96 at 1; ECF 100 at 4–5). At the hearing held on January 17, 2018, the court ruled that D. Kays was not responsible for any restitution relating to the "no-show" employees,

---

[1] Judgment against Mr. Kays was originally entered on May 24, 2018, (ECF 115), but, following a request from Mr. Kays that the court check the box exempting him from participation in the Inmate Financial Responsibility Program, (ECF 117), the court issued an amended J&C, (ECF 118).

(*see* Jan. 17, 2018, Hr'g Tr. at 58:12–14, ECF 122), but that J. Kays was responsible for restitution in that amount, (s*ee id.* at 59:5–8). Accordingly, the government updated its restitution requests and now seeks $1,142,009.97 from J. Kays and $501,400 from D. Kays. (ECF 108). The breakdown of those amounts are as follows: as to J. Kays, the government seeks $886,519.52 (the total billed and paid for "no-show" employees) plus $255,490.45 (loss related to cash payments); as to D. Kays, the government seeks $501,400 (loss related to cash payments). (*Id.* at 2–3).

Having previously determined that J. Kays, but not D. Kays, is responsible for $886,519.52 in restitution for the "no-show" employees, the court will issue an amended judgment reflecting that only Barrow, and not D. Kays, is jointly and severally liable for that amount. The only issue remaining is whether the Kayses owe restitution relating to their cash payments from Barrow and, if so, how such restitution should be apportioned.

## ANALYSIS

As part of their plea agreements, J. and D. Kays each "agree[d] to the entry of a Restitution Order for the full amount of the victim's losses." (ECF 76 at 6; ECF 71 at 6).[2] Pursuant to 18 U.S.C. § 3664, which provides the procedure for issuing restitution orders, where a court determines restitution is appropriate, "the court shall order restitution to each victim in the *full amount of each victim's losses* as determined by the court and without consideration of the economic circumstances of the defendant." *See* § 3664(f)(1)(A) (emphasis added). Within the

---

[2] The government does not specify whether it seeks restitution under 18 U.S.C. § 3663, the Victim and Witness Protection Act ("VWPA"), or 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act ("MVRA"). The Fourth Circuit has held that "in contrast to the VWPA, the MVRA does not contain any language requiring the district court, in determining the total amount of restitution to be ordered, to consider the financial resources of the defendant or the financial needs and earning ability of the defendant and the defendant's dependants." *United States v. Alalade*, 204 F.3d 536, 540 (4th Cir. 2000). The distinction between these two statutes, however, is irrelevant here. The parties agree that restitution is appropriate in the full amount of the government's losses, and the Kayses do not argue that the court should lower the restitution amount based on their financial situation.

meaning of this statute, the phrase "full amount of each victim's losses" means a victim's *actual* loss. *See United States v. Harvey*, 532 F.3d 326, 339 (4th Cir. 2008) (citations omitted). An order of restitution "must be based on sufficient evidence of the amount of actual loss [to the victim]," *id*. at 341, and "a defendant's gain cannot be used as a proxy for actual loss," *see id*. at 340–41.

The parties here dispute whether the government suffered an "actual loss" due to Barrow's cash payments to the Kayses. As explained above, Barrow began making the payments after he was fired from the glass company and could no longer steer glass company business to TLS. These cash payments, which came from MJ-6's profits, were "bribes" or "kickbacks" paid to the Kayses for their efforts at securing government contract work for MJ-6. The bribe money Barrow intended to pay the Kayses was thus built into the profit margin for the subcontract bids he submitted to the "prime contractor," the company that held the government contract and hired subcontractors to work on it. (*See* Hr'g Tr. at 33:25–34:1). The prime contractor accepted these bids without knowing that MJ-6's profits would be used to pay out bribes, and the government later paid MJ-6 for their work also without knowing that bribes were involved. (*See id*. at 34:7–13). The government argues that it is entitled to restitution in the amount of the cash bribes to the Kayses because, despite his representations, Barrow was "willing to provide services to the prime contractor and thus to the government with a lower profit margin than other contractors. . . . The government, not the Kays, should have been the beneficiary of Barrow's willingness to accept a lower profit margin." (ECF 96 at 1–2). Put another way, the government argues that "the loss in this case is the amount of the MJ-6 invoices that is, in the minds of the co-conspirators, set aside for MJ-6 to pay over [to the Kayses]." (Hr'g Tr. at 59:14–18).

"The government bears the burden of proving actual loss by a preponderance of the evidence." *Harvey*, 532 F.3d at 339. At the restitution hearing, the government brought Special

5

Agent Robert Petrole as its only witness. (Hr'g Tr. at 11:3–25). Agent Petrole testified that before a government contract is awarded to a prime contractor, the government independently reviews and approves subcontractor rates. (Hr'g Tr. at 30:8–15). Agent Petrole also testified that when MJ-6 submitted their proposed rates to the prime contractor, the prime contractor found the rates to be fair, (*id*. at 38:1–5), and that MJ-6's rates were "around the same as other subcontractors," (*id*. at 47:23–48:1). Indeed, Agent Petrole agreed that "[t]here's no allegation that the government [] overpa[id] for the services that [it] contracted for," and that "with insignificant exceptions, everything the government paid for under the rates that they approved was performed." (*Id*. at 38:13–15, 39:3–6). Agent Petrole also confirmed that there were no complaints made about the quality of MJ-6's work on the government contracts at issue. (*Id*. at 39:11–15). The evidence at the restitution hearing thus established that the government agreed to pay a certain amount of money to MJ-6 for its services, the service was satisfactory, and the government paid the amount of money it expected to pay.

In determining whether the government has provided sufficient evidence of "actual loss," the court is guided by *Harvey*, a Fourth Circuit case with factual similarities to this one. In *Harvey*, the defendants were convicted of various offenses relating to a scheme whereby defendant Harvey, a civilian employee of the Army, secured a government contract for the company of his friend, defendant Kronstein. *See Harvey*, 532 F.3d at 331–33. Although the government had no complaints about Kronstein's company's performance of the contract, there was evidence that the company failed to comply with certain aspects of the contract and used no-show (or "ghost") employees. *Id*. at 340. The district judge originally imposed restitution in the amount of Kronstein's company's profit margin (eight percent), noting the amount of restitution was "actually a conservative figure . . . the government was just ripped off terribly." *Id*. The

Fourth Circuit, however, vacated the restitution award, finding that the district court "failed to make appropriate findings as to the actual loss incurred by the government" and "erroneously used gain to approximate the amount of actual loss." *Id*. at 341.

On remand, the district court ordered restitution in the amount billed to the government for three no-show employees, and the Fourth Circuit affirmed. *See United States v. Harvey*, No. CRIM. 3:06-CR-00023, 2009 WL 3259428, at *2 (W.D. Va. Oct. 9, 2009), *aff'd*, 405 F. App'x 724 (4th Cir. 2010). The district court noted that because Kronstein's company "did perform some services, albeit deficiently," it could not "award the Government restitution in the amount of . . . the total payout under the [] contract." *Id*. at *1. Instead, the district court reasoned that the "actual loss" to the government was the "amount attributable to the deficient performance" of Kronstein's company on the contract, *id*., specifically finding that "the government suffered $319,923.30 in harm due to the fact that [Kronstein's company] billed it for three ghost employees," *id*. at *2. The district court thus ordered restitution in that amount. *Id*.

Here, like the defendants in *Harvey*, J. Kays and Barrow improperly billed the government for the use of no-show employees and have been ordered to pay restitution in that amount. But, as explained above, the government seeks additional restitution based on the cash payments. The court is not persuaded that simply because Barrow built into his profit margin money he intended to pay as a bribe, the government "lost" that money. Implicit in any business transaction is the understanding that a service provider intends to make a profit; indeed, Agent Petrole indicated that the government sometimes does not accept the lowest bid on a government contract if it believes the rates are too low for the company to stay in business for the duration of the contract. (Hr'g Tr. at 45:21–25). Here, the government determined that MJ-6's rates were reasonable before approving work on the contracts and was, by all accounts, satisfied with the

work. It does not appear, then, that the government "lost" anything in these transactions; it paid what it expected to pay and received what it expected to receive.

Even accepting that the built-in bribe money represents a loss to the government, the government's method for calculating that loss rests on an assumption they cannot prove by a preponderance of evidence. The government's argument for restitution in the amount of the cash payments to the Kayses hinges on the assumption that MJ-6's bids, less the amount in bribe money, would have been accepted by the government and the contracts thus fulfilled at lower cost to the government. (*See* Hr'g Tr. at 45:2–6). But while Agent Petrole testified that the prime contractor would have had the *authority* to accept a lower bid from MJ-6, so long as it was within the range of reasonable rates negotiated between the prime contractor and the government, (*id*. at 47:3–15), the government provided no additional evidence suggesting that a lower bid from MJ-6 would have *actually* been accepted, (*see id*. at 45:21–46:7 (Agent Petrole unable to determine whether the government would have accepted lower bids from MJ-6)). Without evidence to support the government's counterfactual scenario, the court cannot find that it has demonstrated "actual loss."

The government cites several out-of-circuit cases for the proposition that the government's "actual loss" is measured by amounts paid in bribes or kickbacks. (*See* ECF 96 at 2 (citing *United States v. McNair*, 605 F.3d 1152, 1228 (11th Cir. 2010); *United States v. Gaytan*, 342 F.3d 1010, 1012 (9th Cir. 2003); *United States v. Gamma Tech Industries*, 265 F.3d 917, 929 (9th Cir. 2001); *United States v. Vaghela*, 169 F.3d 729, 736 (11th Cir. 1999)). These cases, however, are either distinguishable from this case or employ reasoning that appears to contradict Fourth Circuit precedent. In *McNair*, the Eleventh Circuit appears to have upheld the restitution order based only on the evidence that the defendant received that amount in bribe

money and on the court's observation that "when a public official acquires an ill-gotten benefit as a result of his office, the government suffers losses in that amount." *See* 605 F.3d at 1222. In *Gayton*, the Ninth Circuit upheld an order of restitution based on similar reasoning. *See* 342 F.3d 1011–12. *Gamma Tech* is distinguishable from this case because (1) the kickbacks were paid from inflated charges in noncompetitively awarded contracts, and (2) the restitution amount was based on an application of California agency law. *See* 265 F.3d at 928–29. And in *Vaghela*, the Eleventh Circuit ordered restitution in the amount paid in kickbacks at least in part because the defendant did not contest he owed that amount in restitution. *See* 169 F.3d at 736. Accordingly, the court believes these cases are either factually distinguishable or do not comport with *Harvey*, in which the Fourth Circuit held that the government must do more than show a defendant's ill-gotten gain to demonstrate "actual loss" to a victim.

The defendants' conduct in paying and accepting bribes was, of course, illegal, and their convictions on bribery charges reflects the seriousness of that conduct. But the government is not entitled to additional restitution based on after-the-fact knowledge that Barrow used part of MJ-6's pre-approved profit margin to pay bribes. If the government had hired an honest subcontractor, with rates similar to MJ-6's, (*see* Hr'g Tr. at 47:23–48:1 (MJ-6's rates "around the same as other subcontractors")), but without a built-in amount for bribes, the government would not be entitled to a partial refund simply because it could have gotten a better deal elsewhere. Accordingly, the court will not order restitution based on the cash payments to the Kayses.[3]

## CONCLUSION

For the foregoing reasons, the government's motion for restitution will be denied. The order of restitution against J. Kays will remain at $886,519.52, which represents the loss to the

---

[3] As the court declines to order restitution based on the cash payments, it need not address apportionment.

government related to the "no-show" employees. No restitution will be imposed on D. Kays. A separate order follows.

| | |
|---|---|
|    4/21/20    <br> Date |       /S/      <br> Catherine C. Blake <br> United States District Judge |